UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WIBC ARUBA N.V.

                       Plaintiff,

               -against-

MICHAEL BELFONTI

                       Defendant.

Index No. 11 Civ 5423 (RJH)

**COMPLAINT**

Plaintiff WIBC Aruba N.V. ("WIBC"), by its attorney's Cadwalader Wickersham & Taft LLP, for its Complaint against Michael Belfonti ("Belfonti" or "Defendant") alleges as follows:

**NATURE OF THE ACTION**

1.      This is an action to enforce Defendant's guaranty of a US$230,000,000.00 Mortgage Loan provided to a subsidiary of Defendant by Plaintiff in connection with Defendant's purchase and financing of the Westin Aruba Resort (the "Hotel") in May 2006.

2.      On or about May 3, 2006, Plaintiff WIBC made a mortgage loan to Aruba Hotel Enterprises, N.V. ("AHE"), which was wholly owned by Belfonti, in the amount of US$230,000,000.00 (the "Mortgage Loan") in connection with AHE's purchase of the Hotel. The terms of the Mortgage Loan were memorialized in a loan agreement between AHE (as borrower) and WIBC (as lender), dated May 3, 2006 (the "Mortgage Loan Agreement"). Belfonti signed the Mortgage Loan Agreement on behalf of AHE.[1]

---

[1] Unless defined herein, capitalized terms are defined terms in the Loan Agreement.

3.    The principal collateral for the Mortgage Loan was the Hotel and all of its associated income and leases, including the lease for the Casablanca Casino (the "Casino") located in the Hotel.

4.    As additional security for the payment of the Mortgage Loan, AHE Holding N.V. ("AHE Holding"), the owner of 100% of the shares of AHE, and BCP Sunset Holdings II N.V. ("BCP Sunset"), the owner of 100% of the shares in AHE Holding, respectively pledged the equity shares of AHE Holding and AHE to WIBC.

5.    In addition, to induce WIBC to make the Mortgage Loan, WIBC required and Defendant provided a recourse carve-out guaranty that AHE would meet its obligations.  On May 3, 2006, in connection with the Mortgage Loan, Defendant executed a guaranty agreement for the benefit of WIBC (the "Guaranty").

6.    At the time WIBC agreed to make the Mortgage Loan, a significant portion of AHE's revenue and value was derived from a lease agreement between AHE (as lessor) and Diamond Gaming (as lessee) which required that Diamond Gaming make monthly rental payments to AHE in the amount of $275,000.00 and permitted the parties to terminate the lease at will upon thirty days' notice (the "Casino Lease").

7.    Unbeknownst to WIBC, and before WIBC made the Mortgage Loan, Belfonti, through BCP Florin, LLC ("BCP") (Belfonti's real estate investment vehicle based in New York City), entered into an agreement, dated April 21, 2006, with Diamond Gaming whereby Belfonti would be able to cause BCP to purchase Diamond Gaming for a nominal sum. After WIBC made the Mortgage Loan, Belfonti exercised such rights, by causing BCP to secretly purchase the stock in the company that owned Diamond Gaming for only US$1,000. Thus, from that point forward, both parties to the Casino Lease were owned and controlled by Belfonti.  All of this was intentionally concealed from WIBC by Belfonti.

8.       As it became apparent in early 2007 that BCP would likely default on its obligations and Belfonti would consequently lose his beneficial ownership of AHE, Belfonti caused the two entities he then controlled (AHE and Diamond Gaming) to secretly "amend" the Casino Lease.  This amendment purported to (i) reduce Diamond Gaming's monthly rental payment from US$275,000 to only US$60,000; and (ii) eliminate the at-will termination provision contained in the Casino Lease, thus binding AHE to a thirty year lease term at a drastically reduced rental rate (which could only be terminated for cause).

9.       The purported amendment to the Casino Lease was a blatant but hidden self-dealing transaction.  It provided AHE (at a time when Belfonti expected to lose control of AHE) with no consideration and caused it to lose substantial value.  At the same time, the purported amendment provided a substantial, undeserved economic benefit (i.e., a monthly rental savings of $215,000 per month for potentially thirty years) to Diamond Gaming (the entity beneficially owned by Belfonti).

10.      The purported amendment to the Casino Lease was intentionally concealed from WIBC by Belfonti and effectuated in knowing disregard to WIBC's consent rights under the Mortgage Loan (as well as similar consent rights of other parties).

11.      As described more fully below, the aforementioned acts trigger Defendant's obligations under the Guaranty.  By this action, WIBC asserts a claim under the Guaranty in an amount to be determined at trial, but not less than $349,632964.35, plus attorneys' fees and costs reasonably incurred, to be assessed against Defendant.  WIBC reserves all its rights and remedies under the Loan Documents and at law and in equity with respect to all existing and future Events of Default.

## THE PARTIES

12.     Plaintiff WIBC Aruba N.V. ("WIBC") is an Aruban limited liability company with its principal place of business at Oranjestad, Aruba.  WIBC is an affiliate of Wells Fargo Bank, N.A., successor-by-merger to Wachovia Bank, National Association.  WIBC is in the business of, among other things, making loans secured by commercial real estate.

13.     Defendant Michael Belfonti ("Belfonti") is an individual citizen of the State of Connecticut.

## JURISDICTION AND VENUE

14.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the dispute is between citizens of one or more states within the United States on one hand and a citizen of a foreign state on the other hand.

15.     Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to these claims occurred in this District.  Defendant is also subject to personal jurisdiction in this District at the time this action is commenced.

16.     Jurisdiction and venue are also proper pursuant to Section 5.3(b) of the Guaranty which provides that "any legal suit, action or proceeding against [WIBC] or [Defendant] arising out of or relating to this Guaranty shall be instituted in any Federal or State court in the City of New York, County of New York, and at the option of [WIBC], may be instituted in either Federal or State Court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York general Obligations Law."

## FACTS

17.     In April 2006, Belfonti became the majority beneficial owner of Aruba Hotel Enterprises, N.V. ("AHE").  At that time, Belfonti held seventy-five percent ownership

interest in AHE.  Belfonti subsequently acquired the remaining 25% ownership interest in AHE in or around May 2006.

18.    In May 2006, AHE purchased what is now known as the Westin Aruba Resort (the "Hotel"), which is AHE's principal asset.  To finance the purchase of the Hotel, Belfonti arranged for two loans: (i) a mortgage loan; and (ii) a mezzanine loan.

## A.    The Mortgage Loan

19.    The Mortgage Loan was made to AHE by WIBC, which is a wholly-owned affiliate of Wachovia Bank, National Association ("WBNA"), in the amount of US$230,000,000.00 (the "Mortgage Loan").    The terms of the Mortgage Loan were memorialized in a loan agreement between AHE (as borrower) and WIBC (as lender), dated May 3, 2006 (the "Mortgage Loan Agreement").  Belfonti signed the Mortgage Loan Agreement on behalf of AHE.

20.    The full amount of the Mortgage Loan was funded by two other loans to WIBC: (i) a loan from WBNA to WIBC in the amount of US$200,000,000.00; and (ii) a loan from Petra Mortgage Capital Corp. LLC ("Petra") to WIBC in the amount of US$30,000,000.00.

21.    Wells Fargo Bank, National Association, as successor by merger to WBNA, is acting as special servicer of the Mortgage Loan on behalf of the holders in interest of the Mortgage Loan.  The Mortgage Loan secures repayment of two notes: (i) a senior promissory note ("Note A"); and (ii) a subordinate note ("Note B").

22.    The principal collateral for the Mortgage Loan was the Hotel and all of its associated income and leases, including the lease for the Casablanca Casino (the "Casino") located in the Hotel.

23.    As additional security for the payment of the Mortgage Loan, AHE Holding N.V. ("AHE Holding"), the owner of 100% of the shares of AHE, and BCP Sunset

Holdings II N.V. ("BCP Sunset"), the owner of 100% of the shares in AHE Holding, respectively pledged the equity shares of AHE Holding and AHE to WIBC.

24.     Pursuant to the Mortgage Loan, AHE made certain representation and warranties.  Specifically, pursuant to Section 3.1.24, AHE represented and warranted to WIBC that "as of the date hereof . . . and until such time as the Debt shall be paid in full: . . . (aa) [AHE] is not involved in any dispute with any taxing authority [and] (bb)[AHE] has paid and will pay all taxes which it owes."

**B.     The Mezzanine Loan**

25.     To finance the purchase of the Hotel, Belfonti also arranged for a mezzanine loan.

26.     The mezzanine loan was made by Petra to BCP Florin, LLC ("BCP") in the amount of US$19,450,000.00 (the "Mezzanine Loan").

27.     The terms of the Mezzanine Loan were memorialized in a loan and security agreement executed on or about June 9, 2006.  At the time of the Mezzanine Loan, Belfonti was a seventy-five percent beneficial owner of BCP.

28.     The Mezzanine Loan was secured by a security interest in one hundred percent of the issued and outstanding equity in Twilight Holdings, LLC ("Twilight").  Twilight, a Delaware LLC, is an indirect subsidiary of BCP, which is an indirect parent of AHE, and which, at the time, was majority-beneficially-owned by Belfonti.

**C.     The Guaranty**

29.     In addition, to induce WIBC to make the Mortgage Loan, WIBC required and Defendant provided a recourse carve-out guaranty.

30.     On May 3, 2006, in connection with the Mortgage Loan, Defendant executed a guaranty agreement for the benefit of WIBC (the "Guaranty").  Attached hereto as Exhibit A, is a true and correct copy of the Guaranty.

31.     Pursuant to the Guaranty, Defendant is liable as guarantor of payment to WIBC for any loss, damage, cost, expense, liability, claim or other obligation incurred by WIBC (including attorneys' fees and costs reasonably incurred) arising out of or in connection with various enumerated acts by AHE (the borrower of the Mortgage Loan) and/or Defendant.

32.     Specifically, pursuant to Section 1.1 of the Guaranty, Defendant "irrevocably and unconditionally guarantees to [WIBC] and its successors and assigns the payment and performance of the Guaranteed Obligations [(as defined below)] as and when the same shall be due and payable . . . [and] covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor."

33.     Section 1.2 of the Guaranty provides that:

Guaranteed Obligations means: (a) any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(i) the misapplication or conversion by [AHE] of . . . (C) any Rents or security deposits collected with respect to the Property, or (D) any Gross Revenues from the Property;

(ii) intentional damage to or physical waste of the Property, and damage or loss in value to the Property resulting from the gross negligence of [AHE];

(iii) fraud or intentional misrepresentation by [AHE] or [Defendant] in connection with the [Mortgage Loan]

34.     Section 1.2 of the Guaranty further provides that "[n]otwithstanding anything to the contrary in any of the Loan Documents, . . . (ii) [Defendant] shall be liable for the full amount of the Debt (and the full amount of the Debt shall be deemed to be part of the

Guaranteed Obligations) in the event that . . . (B) [AHE] fails to obtain [WIBC's] prior written consent to any assignment, transfer, or conveyance, direct or indirect, of the Property or any interest therein or [AHE] or any interest in [AHE] as required by the Loan Agreement, the Mortgage or any other Loan Documents; . . ."

35.     Pursuant to Section 4.2.1 of the Mortgage Loan Agreement, "[w]ithout the prior written consent of [WIBC], neither the [AHE] nor any other Person having a direct or indirect ownership or beneficial interest in [AHE], shall sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or transfer any interest, direct or indirect, in the [AHE], the Property or any part thereof, whether voluntarily or involuntarily, in violation of the covenants and conditions set forth in the Mortgage."

36.     Moreover, as set out in Section 4.1.9(a) of the Mortgage Loan Agreement, any amendment to the Casino Lease requires the consent and approval of WIBC, as lender thereunder.  Section 4.1.9(a) of the Mortgage Loan Agreement provides that  "[a]ll Major Leases and all renewals, amendments and modifications thereof executed after the date hereof shall be subject to [WIBC's] prior approval, which approval shall not be unreasonably withheld or delayed."   Major Leases are expressly defined within the Mortgage Loan Agreement to include the Casino Lease. *See* Mortgage Loan Agreement § 1.1.

37.     Section 4.1.9(b) further provides that "[AHE] . . . (v) shall not alter, modify or change any Lease so as to change the amount of or payment date of rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the lessee or increase the obligations of lessor".

38.     Section 8.1 of the Mortgage Loan Agreement further provides that "[e]xcept as may otherwise be provided in Section 8.2, no Transfer shall be permitted without

Lender's prior written consent (which may be granted or denied in Lender's sole and absolute discretion)."

39.    As used in the Guaranty, the term "Property" means "the parcel or real property (on the island of Aruba in the kingdom of the Netherlands), the Improvements thereon and *all personal property* owned by [AHE], together with *all rights pertaining to such property* and Improvements, including under the Ground Lease." *See* Mortgage Loan Agreement § 1.1 (emphasis added).

40.    Accordingly, Rental income due to AHE under the Casino Lease is plainly Property (or an interest therein) which, pursuant to Section 1.2 of the Guaranty and Sections 4.2.1, 4.1.9 and 8.1 of the Mortgage Loan Agreement, may not be transferred without WIBC's prior written consent.

**D.    The Casino Lease**

41.    The Casino is located on the Hotel's premises.

42.    AHE holds a gambling license (the "Gambling License"), issued by the Aruban government, to operate the Casino.  AHE is permitted to contract with a third party to operate the Casino consistent with the terms of AHE's Gambling License.

43.    At the time that WIBC issued the Mortgage Loan, a significant portion of AHE's revenue (and AHE's value) was derived from an lease agreement for the Casino.

44.    This agreement, between AHE as lessor and Diamond Gaming Corporation N.V. ("Diamond Gaming") as lessee, was originally dated as of November 1, 2005 and subsequently amended on April 21, 2006 (the "Casino Lease").

45.    At that time, Casablanca Gaming Management Company S.A. ("Casablanca") was the sole shareholder of Diamond Gaming.

46.     As amended, the Casino Lease required Diamond Gaming to make monthly rental payments to AHE in the amount of US$275,000.  The Casino Lease expressly provided that Diamond Gaming's rent obligation would not be adjusted during its ten year term. In addition, under the Casino Lease, Diamond Gaming was obligated to pay AHE fifty percent of Diamond Gaming's net profits from the operation of the Casino in excess of $416,667 per month.

47.     The Casino Lease was also terminable at will by either party on thirty days' notice.  A true and correct copy of the Casino Lease is attached hereto as Exhibit B.

**E.     The Put and Call Agreement**

48.     Prior to the execution of the Mortgage Loan Agreement, and unbeknownst to WIBC, Belfonti, through BCP (Belfonti's real estate investment vehicle based in New York City), entered into an agreement, dated April 21, 2006, with Diamond Gaming whereby Belfonti would be able to cause BCP to purchase Diamond Gaming for a nominal sum (the "Put-and-Call Agreement").  A true and correct copy of the Put and Call Agreement is attached hereto as Exhibit C.

49.     The Put and Call Agreement was a vehicle by which Belfonti, through BCP, could gain control over Diamond Gaming, by purchasing Diamond Gaming's stock for a nominal sum.

50.     Specifically, this Put-and-Call Agreement effectively gave Belfonti the right to buy Diamond Gaming for US$1,000.

51.     This Put-and-Call Agreement was not disclosed to WIBC prior to the execution of the Mortgage Loan Agreement and was deliberately concealed from WIBC by Belfonti.

52.    In or around December 2006, after the Mortgage Loan Agreement had been executed, Belfonti exercised his rights under the Put-and-Call Agreement causing BCP to secretly purchase the stock in the company that owned Diamond Gaming for only US$1,000.  As a result, Belfonti assumed control of Diamond Gaming and thereby controlled both parties to the Casino Lease.

53.    Belfonti's purchase of Diamond Gaming's stock was deliberately concealed from WIBC by Belfonti.

**F.**    **The Purported "Amendment" to the Casino Lease**

54.    In or about January 2007, AHE began to experience cash flow difficulties attributable to the rapidly deteriorating financial performance of the Hotel.  Accordingly, at or about that time, it became apparent to Belfonti that BCP would likely soon default on its obligation to Petra under the Mezzanine Loan, and upon such a default Petra would likely foreclose on it security interest and assume ownership of and control over AHE.

55.    In light of this impending foreclosure, some time between January and April 2007, Belfonti caused the two entities he then controlled, AHE and Diamond Gaming, to secretly "amend" the Casino Lease by entering into the Purported Amendment of the Casino Lease, dated January 22, 2007 (the "Purported 2007 Lease Amendment").  A copy of the Purported 2007 Lease Amendment is attached hereto as Exhibit D.

56.    Specifically, on April 16, 2007, Robert Rosenberg ("Rosenberg"), a member of the Supervisory Board of AHE, was notified of a meeting of AHE's Supervisory Board that was scheduled to take place the following day, April 17, 2007, at noon E.S.T., via teleconference.    While Mr. Rosenberg also served as a Managing Director of WBNA, his membership on the Supervisory Board of AHE was not in his capacity as a director of WBNA.

57.     The notice provided to Mr. Rosenberg regarding the April 17 teleconference was notably defective and did not meet the requirements for such a call.  Due to the short notice and his prior commitments, Rosenberg was unable to attend the teleconference.

58.     The April 17 meeting was attended by only Belfonti and his lawyer, Dana Eric Friedman ("Friedman").

59.     During the meeting, Belfonti and Friedman approved the Purported 2007 Lease Amendment.

60.     The Purported 2007 Lease Amendment was dated January 22, 2007, approximately three months prior to the date on which the amendment was approved.

61.     In pertinent part, the Purported 2007 Lease Amendment purported to reduce Diamond Gaming's monthly rental payment from US$275,000 to a mere US$60,000, and also purported to eliminate the at-will termination provision contained in the Casino Lease and bind AHE to a possible thirty year lease term.

62.     Diamond Gaming gave no consideration to AHE for these concessions. The Purported 2007 Lease Amendment is completely one-sided and benefits only Diamond Gaming, and BCP and Belfonti, as Diamond Gaming's direct and beneficial owners.

63.     The Purported 2007 Lease Amendment was concealed from WIBC by Belfonti and WIBC did not learn of its existence until in or around May 2007.

64.     As noted, pursuant to Sections 4.2.1, 4.1.9 and 8.1 of the Mortgage Loan Agreement, Belfonti and his entities were expressly prohibited from amending the Casino Lease without the prior written consent of WIBC.  WIBC's prior written consent for the Purported 2007 Lease Amendment was neither sought nor obtained by Belfonti.

65.     Promptly upon learning of the existence of the alleged amendment, WBNA, on behalf of WIBC and the Holders, delivered written notice by letters dated May 4,

2007 and June 1, 2007 (collectively the "Notice Letters"), to both Mr. Belfonti and Diamond Gaming advising them that the alleged amendment had not been, and was not, approved by WIBC and that the execution of the alleged amendment was an event of default under the terms of the Mortgage Loan. In addition, the Notice Letters asserted that the reduction of rent purportedly implemented by the alleged amendment was null and void and demanded that the rent that was in effect prior to the invalid modification be reinstated.

66.     Further, AHE's operating agreement with the operator of the Hotel, Westin Aruba Hotel Management LLC, provided the operator with a similar consent right. Westin's consent to the Purported 2007 Lease Amendment was neither sought nor obtained.

67.     Because the Purported 2007 Lease Amendment purported to reduce AHE's rental income under the Casino Lease, it constitutes a transfer in violation of Sections 4.2.1, 4.1.9 and 8.1 of the Mortgage Loan Agreement.

68.     As a result of the Purported 2007 Lease Amendment, from April 2007 through October 2010, Diamond Gaming has failed to meet its obligation to make monthly rental payments to AHE of $275,000.00.   Accordingly, the value of AHE and the Hotel, part of WIBC's security interest under the Mortgage Loan, has been substantially diminished.

69.     In light of the foregoing, Plaintiff hereby demands that Belfonti make due on the Guaranteed Obligations in the amount of no less than $230,000,000, plus attorneys' fees and costs reasonably incurred in connection with the enforcement of the Guaranty.

**G.     Mortgage and Mezzanine Loan Defaults and WIBC's Foreclosure of AHE**

70.     In April 2007, BCP defaulted on the Mezzanine Loan and failed to cure its default.  As anticipated, in May 2007, Petra foreclosed on its security interest in Twilight and in so doing, assumed the beneficial ownership of, and control over, AHE.

71.     In or around November 2008, AHE failed to comply with its payment obligations under the Mortgage Loan.  Subsequently, WIBC issued notices of default to AHE on a monthly basis.

72.     On or about March 26, 2009, WIBC terminated the Mortgage Loan and accelerated the payment of the total outstanding amount due to WIBC thereunder.

73.     Thereafter, WIBC proceeded to foreclose upon the pledge of the equity interest in AHE and AHE Holding.  By order, dated May 20, 2009, the Court of First Instance of Aruba held that AHE and AHE Holding shares will accrue to WIBC.

74.     Subsequent, in or around May 2010, AHE received a profit tax claim, in the amount of 5,334,385.00 Aruban florin, from the Aruban tax authority for accrued and unpaid profit taxes due and payable by AHE for the taxable year of 2005 (the "Profit Tax Claim").

<u>**FIRST CLAIMS FOR RELIEF**</u>
**(Against Defendant for Full Recovery of the**
**Unpaid Balance of the Mortgage Loan Pursuant**
**to the Guaranty)**

75.     WIBC repeats and realleges the allegations set forth in paragraphs 1 through 74 of the Complaint as if fully set forth herein.

76.     The Guaranty is a valid and enforceable contract between WIBC and Defendant.

77.     WIBC has fully performed its obligations related to the Guaranty.

78.     Pursuant to Sections 1.1 and 1.2 of the Guaranty, Defendant guaranteed to WIBC the payment and performance of the Guaranteed Obligations (as defined in the Guaranty) and to pay WIBC for any loss, damage, cost, expense, liability claim or other obligation incurred by WIBC in connection with the failure to perform Guaranteed Obligations.

79.     As set forth above, Section 1.2 of the Guaranty provides that "[n]otwithstanding anything to the contrary in any of the Loan Documents, . . . (ii) [Defendant] shall be liable for the full amount of the Debt (and the full amount of the Debt shall be deemed to be part of the Guaranteed Obligations) in the event that . . . (B) [AHE] fails to obtain [WIBC's] prior written consent to any assignment, transfer, or conveyance, direct or indirect, of the Property or any interest therein or [AHE] or any interest in [AHE] as required by the Loan Agreement, the Mortgage or any other Loan Documents; . . ."

80.     The Purported 2007 Lease Amendment, and the reduction in rental income to the Hotel and AHE that it purported to effectuate, constitutes a impermissible transfer of the Property and/or an interest therein without the consent of WIBC required pursuant to Sections 4.2.1, 4.1.9 and 8.1 of the Mortgage Loan Agreement.

81.     Section 4.2.1 of the Mortgage Loan Agreement provides that "[w]ithout the prior written consent of [WIBC], neither the [AHE] nor any other Person having a direct or indirect ownership or beneficial interest in [AHE], shall sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or transfer any interest, direct or indirect, in the [AHE], the Property or any part thereof, whether voluntarily or involuntarily, in violation of the covenants and conditions set forth in the Mortgage."

82.     In addition, Section 4.1.9(a) of the Mortgage Loan Agreement provides that "[a]ll Major Leases and all renewals, amendments and modifications thereof executed after the date hereof shall be subject to [WIBC's] prior approval, which approval shall not be unreasonably withheld or delayed."   Major Leases are expressly defined within the Mortgage Loan Agreement to include the Casino Lease.  *See* Mortgage Loan Agreement § 1.1.

83.     Section 4.1.9(b) further provides that "[AHE] . . . (v) shall not alter, modify or change any Lease so as to change the amount of or payment date of rent, change the

expiration date, grant any option for additional space or term, materially reduce the obligations of the lessee or increase the obligations of lessor".

84.     Section 8.1 of the Mortgage Loan Agreement further provides that "[e]xcept as may otherwise be provided in Section 8.2, no Transfer shall be permitted without Lender's prior written consent (which may be granted or denied in Lender's sole and absolute discretion)."

85.     Defendant is thus liable to WIBC for the unpaid balance of the Mortgage Loan.

86.     Pursuant to Section 1.8 of the Guaranty, in the event that Defendant should breach or fail to timely perform any provisions of the Guaranty, Defendant is also liable to WIBC for all costs and expenses (including court costs and reasonable attorneys' fees) incurred by WIBC in connection with the enforcement of the Guaranty.

87.     For the foregoing reasons, WIBC is entitled to a judgment against Defendant in an amount to be determined at trial but that is believed to be in excess of $335,389,761, including the unpaid principal balance, servicer advances and fees, unpaid interest, late charges and default interest, plus attorneys' fees and costs reasonably incurred in connection with the enforcement of the Guaranty.

**SECOND CLAIM FOR RELIEF**
**(Against Defendant to Enforce the Guaranty**
**With Respect to the Purported 2007 Lease**
**Amendment)**

88.     WIBC repeats and realleges the allegations set forth in paragraphs 1 through 87 of the Complaint as if fully set forth herein.

89.     The Guaranty is a valid and enforceable contract between WIBC and Belfonti.

90.     WIBC has fully performed its obligations related to the Guaranty.

91.     Pursuant to Sections 1.1 and 1.2 of the Guaranty, Defendant guaranteed to WIBC the payment and performance of the Guaranteed Obligations (as defined in the Guaranty) and to pay WIBC for any loss, damage, cost, expense, liability, claim or other obligation incurred by WIBC in connection with the failure to perform Guaranteed Obligations.

92.     The conduct set forth herein in connection with the Purported 2007 Lease Amendments triggers the Belfonti's obligations under the Guaranty.

93.     WIBC has sustained losses and damage, including the diminished value of the Hotel and AHE, as a result of Diamond Gaming's failure to pay the US$275,000 monthly rent under the Casino Lease and the elimination of the at-will termination provision, which arose from (i) the fraud and intentional misrepresentation of Belfonti; (ii) the misapplication and conversion of Rents and Gross Revenues; and (iii) the grossly negligent or intentional damage of the Hotel and AHE.

94.     Pursuant to Section 1.1(a)(i) through (iii) of the Guaranty, Defendant is liable for losses incurred as a result of (i) the "misapplication or conversion" by AHE of any Rents collected with respect to the Property or Gross Revenues from the Property; (ii) "intentional damage to or physical waste of the Property, and damage or loss in value to the Property resulting from the gross negligence of [AHE]"; and (iii) "fraud or intentional misrepresentation" by AHE or Belfonti in connection with the Mortgage Loan.

95.     In violation of Section 1.1(a)(i), AHE converted and misapplied the Rents and/or Gross Revenues of the Property by relieving Diamond Gaming of its US$275,000 monthly rent obligation and modifying the terms of the Casino Lease.

96.     In violation of Section 1.1(a)(ii), the Purported 2007 Lease Amendment entered into by and between AHE and Diamond Gaming constituted intentional and/or grossly

negligent damage to the value of the Hotel and AHE by relieving Diamond Gaming of its US$275,000 monthly rent obligation and modifying the terms of the Casino Lease.

97.     In violation of Section 1.1(a)(iii), Belfonti engaged in a scheme to defraud Plaintiff in connection with the Mortgage Loan by: (a) secretly causing BCP to enter into the Put and Call Agreement; (b) secretly causing BCP to purchase Diamond Gaming's stock; (c) secretly causing AHE and Diamond Gaming to enter into the Purported 2007 Lease Amendment, in violation of WIBC's consent rights under the Mortgage Loan; (d) causing Diamond Gaming not to pay the full amount of its US$275,000 monthly rent obligation; and (e) modifying the terms of the Casino Lease.

98.     Based on foregoing allegations, Belfonti, with actual intent to defraud Plaintiff, concealed each of the transactions set out in paragraph 97 above, all of which were highly material and adverse to Plaintiff, in an effort to induce Plaintiff to issue the Mortgage Loan.  Plaintiff justifiably relied on such material omissions and as a result suffered damages  in an amount to be determined at trial.

99.     Defendant is  thus liable to WIBC under the Guaranty for losses and damages incurred.

100.     Pursuant to Section 1.8 of the Guaranty, in the event that Defendant should breach or fail to timely perform any provisions of the Guaranty, Defendant are also liable to WIBC for all costs and expenses (including court costs and reasonable attorneys' fees) incurred by WIBC in connection with the enforcement of the Guaranty.

101.     For the foregoing reasons, WIBC is entitled to a judgment against Defendant in an amount to be determined at trial but that is believed to be in excess of $11,263,100, plus accrued interest and attorneys' fees and costs reasonably incurred in connection with the enforcement of the Guaranty.

## THIRD CLAIM FOR RELIEF
### (Against Defendant to Enforce the Guaranty
### With Respect to the Profit Tax Claim)

102.    WIBC repeats and realleges the allegations set forth in paragraphs 1 through 101 of the Complaint as if fully set forth herein.

103.    The Guaranty is a valid and enforceable contract between WIBC and Defendant.

104.    WIBC has fully performed its obligations related to the Guaranty.

105.    Pursuant to Sections 1.1 and 1.2 of the Guaranty, Defendant guaranteed to WIBC the payment and performance of the Guaranteed Obligations (as defined in the Guaranty) and to pay WIBC for any loss, damage, cost, expense, liability, claim or other obligation incurred by WIBC in connection with the failure to perform Guaranteed Obligations.

106.    The conduct set forth herein in connection with the Profit Tax Claim triggers the Defendant's obligations under the Guaranty.

107.    WIBC has sustained losses and damage as a result of the Profit Tax Claim, which arose from the intentional misrepresentation of AHE in connection with the Mortgage Loan.

108.    Pursuant to Section 1.1(a)(iii) of the Guaranty, Defendant is liable for losses incurred as a result of (iii) "fraud or intentional misrepresentation" by AHE or Belfonti in connection with the Mortgage Loan."

109.    In violation of Section 1.1(a)(iii), AHE intentionally misrepresented to WIBC that "as of the date hereof . . . and until such time as the Debt shall be paid in full: . . . (aa) [AHE] is not involved in any dispute with any taxing authority [and] (bb) [AHE] has paid and will pay all taxes which it owes."

110.   Contrary to AHE's representation, AHE owed an unpaid profit tax in the amount of 5,334,385.00 Aruban florin for the year of 2005.

111.   Defendant is  thus liable to WIBC under the Guaranty for losses and damages incurred.

112.   Pursuant to Section 1.8 of the Guaranty, in the event that Defendant should breach or fail to timely perform any provisions of the Guaranty, Defendant ia also liable to WIBC for all costs and expenses (including court costs and reasonable attorneys' fees) incurred by WIBC in connection with the enforcement of the Guaranty.

113.   For the foregoing reasons, WIBC is entitled to a judgment against Defendant in an amount to be determined at trial, but not less than 5,334,385.00 Aruban florin, plus accrued interest and attorneys' fees and costs reasonably incurred in connection with the enforcement of the Guaranty.

## RELIEF DEMANDED

WHEREFORE, WIBC respectfully demands judgment as follows:

(a)   On the first claim for relief, for an amount to be determined at trial, but not less than $335,389,761, together with additional servicer advances and fees, unpaid interest, late charges and default interest, as accrued, plus attorneys' fees and costs reasonably incurred, to be assessed against Defendant;

(b)   On the second claim for relief, for an amount to be determined at trial, but not less than $11,263,100, plus accrued interest and attorneys' fees and costs reasonably incurred, to be assessed against Defendant;

(c)      On the third claim for relief, for an amount to be determined at trial, but not less than 5,334,385.00 Aruban florin, plus accrued interest and attorneys' fees and costs reasonably incurred, to be assessed against Defendant;

(d)      for such other and further relief, including interest, costs, disbursements and attorneys' fees, as the Court may deem just and proper.

Dated:      New York, New York
             August 4, 2011

CADWALADER, WICKERSHAM & TAFT LLP


By:      _____/s/Howard R. Hawkins, Jr._____
             Howard R. Hawkins, Jr.
             Michael N. Abdo

Office and Post Office Address:
One World Financial Center
New York, NY 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

*Attorneys for WIBC Aruba N.V.*